Northern Illinois College of Optometry v. Commissioner.
Northern Illinois College of Optometry v. Commissioner
Docket No. 108632.
United States Tax Court
1943 Tax Ct. Memo LEXIS 144; 2 T.C.M. (CCH) 664; T.C.M. (RIA) 43396; August 23, 1943
*144 Redmond S. Brennan, Esq., and George M. Doty, C.P.A., for the petitioner. Gerald W. Brooks, Esq., and Clifford P. Hickok, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency of $3,283.15 in the petitioner's income tax for the fiscal period January 1 through August 31, 1937, and deficiencies of $16,590.27 and $2,274.68 in its income and excess profits taxes, respectively, for the fiscal year ended August 31, 1938. The issues presented by the pleadings are the correctness of the respondent's action: (1) in determining that the petitioner is not a corporation exempt from Federal income and excess profits taxes; (2) in disallowing as excessive $25,000 and $35,299.99 of the amounts deducted by petitioner in the respective taxable periods as salaries; (3) in disallowing $3,369.02 of the deduction taken by petitioner for depreciation for the year ended August 31, 1938; and (4) in including in taxable income for the year ended August 31, 1938, as deferred tuition, the amount of $16,013.53. By an amended answer, the respondent alleges with respect to issue (4) that he erred in not increasing taxable income by the amount *145 of $23,319.67 instead of $16,013.53. In the amended answer he also alleges that deductions of $65.42 and $783.96 taken in the taxable periods 1937 and 1938, respectively, as stoker rental, were erroneously allowed by him and requests that they be held not deductible on the ground that they constituted installment payments on the purchase price of a stoker. The petitioner concedes that the items referred to as stoker rental are not deductible. Findings of Fact The petitioner is an Illinois corporation, with its principal place of business in Chicago. It filed corporation income and excess profits tax returns for the period January 1 through August 31, 1937, and the fiscal year ended August 31, 1938, with the Collector of Internal Revenue for the First Collection District of Illinois. The returns were prepared from books kept on the accrual basis. The petitioner was organized in September 1927, under the name of Needles Northern Illinois College of Optometry. The articles of incorporation were amended in June 1928 changing the name to its present form. The petitioner is the successor to two other institutions, namely, Needles Institute of Optometry and Northern Illinois College of *146 Ophthalmology and Otology. About 1908 or 1909, William B. Needles, who had been practicing optometry in Kansas City, Missouri, obtained a charter for and opened in that city a school known as Needles Institute of Optometry. This corporation was organized as not for profit. Except for a brief interruption during the First World War the school continued to operate until the formation of the petitioner. The Northern Illinois College of Ophthalmology and Otology was organized in 1872 as a business corporation and originally conducted a school to train physicians to fit glasses and to treat diseases of the eye. During the late nineties it discontinued training physicians and began to train others in the fitting of glasses. By about 1923 or 1924, all of those who originally had conducted the school had died except one, who was desirous of having Needles take over the school and continue its operation. About 1923 or 1924 Needles acquired the stock in the Northern Illinois College of Ophthalmology and Otology for a consideration of between $10,000 and $15,000, consisting of a cash payment of between $3,000 and $4,000 and the assumption of all of the liabilities of the college, including *147 obligation to complete instruction of all students (about 100) then in the college. At that time the assets of the school consisted of about 100 chairs, 4 or 5 wall charts and 2 desks. It was known as the oldest school in the field, and had some prestige, though it was considered by many persons as lax in its standards. After acquiring the stock of the Northern Illinois College of Ophthalmology and Otology, Needles divided his time between it and Needles Institute of Optometry and kept both schools in operation until the organization of the petitioner, when the charters of those two schools were permitted to lapse. Thereupon the two old schools ceased to operate and their assets were donated to the petitioner. The assets of Needles Institute of Optometry at that time consisted of testing equipment, printed text and instruction material, models, charts, furniture, etc., all of a value of approximately $50,000. The incorporators of the petitioner were William B. Needles, L. E. Needles and Ernest Occhiena, who were named in the articles of incorporation as the original directors. L. E. Needles, sister of William B. Needles, had been associated with him since about 1909 or 1910 as secretary *148 and assistant manager in the operation of Needles Institute of Optometry. Occhiena had been educated in Italy, and had graduated from Needles Institute of Optometry about 1912. Following his graduation, he was associated with that school in a teaching capacity, and was in charge of it during the interval between the purchase by Needles of the stock in Northern Illinois College of Ophthalmology and Otology and the formation of the petitioner. The petitioner's articles of incorporation recite that the object for which it was formed was to conduct a school or college not for profit, for the education and training of students in the theory and practice of optometry and optometrical science and kindred subjects and such other branches of learning and such other courses of study as may be deemed wise or expedient; to conduct clinics in optometry, science and other branches of learning or research and to do all things necessary or expedient in connection therewith or incidental thereto including the receipt of gifts and endowments and the holding, investment and administration of the same. The management of the petitioner was vested in a board of three directors. That number was increased *149 to six in April 1937, and then to ten in November 1937, by amendments made to the articles of incorporation. The petitioner's by-laws provide that all directors shall be members of the corporation and that only those persons who are so elected by the directors shall be members; that the directors, by majority vote, may forfeit or cancel the membership of any member; that the directors shall be elected annually by the members of the corporation; that the board of directors, by a majority vote, may alter, amend or repeal the by-laws and that no director shall receive any salary for performing the usual and customary duties of director. Although neither the petitioner's charter nor its by-laws contain any provision respecting stockholders, the by-laws provide for the issuance of certificates of membership in the corporation. Neither the articles of incorporation nor the by-laws contain any provisions respecting the payment of dividends and no dividends have ever been declared or paid by the petitioner. Continuously since its organization in 1927, the petitioner has conducted a professional school of optometry in Chicago. There are two agencies having to do with the accrediting of schools *150 of optometry. One is the Council on Education of the American Optometric Association. This association is composed of optometrists throughout the United States and is concerned chiefly with the welfare of the profession, schools of optometry and the public health. Its Council on Education sets the standards to be maintained by schools of optometry to obtain the recognition of the Association. The other agency is the International Association of State Boards of Examiners in Optometry, which is a voluntary group composed of members of the various state boards of examiners in optometry which issue licenses to practice optometry in their respective states. This group also sets certain standards which optometry schools must maintain in order to be recognized by it, and with the exception of a short period in 1936, when the petitioner failed to comply promptly with certain new requirements with respect to the installation of laboratory equipment, it has always given the petitioner a Class A rating. The schools having such a rating by these agencies are not supposed to be operated for profit. In addition to the petitioner, the other schools in United States giving courses in optometry and *151 having such recognition as that given the petitioner by these agencies are Columbia University, Ohio State University, University of Chicago, Pennsylvania State College of Optometry, Massachuetts College of Optometry, Southern College of Optometry and Los Angeles College of Optometry. There are three other schools of optometry that are not so accredited, but are accredited in the states in which situated. From the time of the organization of the petitioner to 1938 various changes were made in its curriculum. At its beginning the petitioner's courses were confined to a few essential subjects that had to do more or less with practical optometry. Gradually courses in basic sciences were added and these courses were supplemented by clinical training. When the petitioner opened in 1927 it gave a course of no fixed length of time. Later it gave a one-year course, which was subsequently increased to two years, and about 1933 was increased to three years, and in the fall of 1938 was increased to four years. The petitioner gives two degrees in course, the degree of Doctor of Optometry and that of Bachelor of Science in Visual Optics. The graduates of the petitioner are recognized for licensing *152 purposes by the boards of examiners in optometry in all of the states except New York, the law of which requires that the college of optometry which the applicant attended must have been a department of a university. The petitioner's officials have always felt that it was advantageous to petitioner, from the standpoint of permanency, to have students from all sections of the United States, if possible, and active steps toward that end have been taken regularly. In 1938 the petitioner had students from 46 different states. Presently it has students from about 33 states. In 1938 the faculty consisted of between 25 and 30 members. The petitioner's approximate enrollment for the years indicated was as follows: Year
1928
120
1929
140
1930
180
1931
250
1932
280
1933
330
1934
320
1935
340
1936
650
Ended August 31,
1937
750
Ended August 31,
1938
850
Ended August 31,
1939
730
Ended August 31,
1940
540
Coincident with the institution of a four-year course by the petitioner in the fall of 1938 there was a decline in its enrollment. There is another school of optometry in Chicago, which is recognized by the Illinois Board of Examiners in Optometry *153 but not accredited by the two national accrediting agencies. This school gives only a two-year course, which is all that is necessary to meet the requirements of the Illinois Board of Examiners, and as a consequence, the number of petitioner's students from Illinois in comparison to the total number of its students is not very large. The petitioner's enrollment in 1938 was equal to the total enrollment of all other colleges of optometry in the United States. The petitioner's application for recognition as an approved college under the Navy V-5 and V-7 enlisted reserve plans for college students was approved by the Navy Department. In the Bulletins of Accredited Higher Institutions issued by the Office of Education, United States Department of the Interior, for the years 1934 through 1938, the petitioner was listed as an accredited institution. The petitioner operates a clinic in connection with its school which affords students of the junior and senior years valuable opportunities to observe techniques and to obtain practice in fitting and adjusting eyeglasses. Such training and experience is a prescribed part of the curriculum of an accredited school of optometry, and in its school *154 bulletin the petitioner mentions and describes this training as a part of the training offered by it in optometry. Patients of the clinic are referred to it primarily by various charitable organizations. The patients are given examinations for correcting defective vision, including the fitting and supplying of eyeglasses. Where the patients are unable to pay, the materials are furnished free. In case the patient is able to pay, the materials are furnished at cost. Patients having eye conditions requiring medical or surgical treatment and who are able to pay are often referred to the clinic by practicing optometrists, but no charge is made for the examination at the clinic. During the periods in 1937 and 1938 in controversy here the clinic had an average of about 14,000 patients annually, who averaged about two visits each. The authorities of the State of Illinois, after investigating the clinic, concluded that it was a charitable enterprise and that it was not subject to sales tax on the materials for which its patients paid. Total receipts from the conduct of the clinic amounted to $5,837.89 for the 8-month period ended August 31, 1937, and $11,939.08 for the fiscal year 1938. The *155 textbooks used by the petitioner's students are not ordinarily available in bookstores in numbers required by the students. and since 1928 the petitioner has been selling textbooks to its students at the regular retail prices. During the fiscal year 1938. the petitioner received $11,416.24 from the sale of textbooks which cost $5,574.60. In 1937 the petitioner acquired certain real estate situated in Chicago which was used in the operation of the school. In 1938 the Assessor of Cook County held that the property was exempt from real estate taxes on the ground that it was used for educational purposes. William B. Needles, L. E. Needles and Occhiena, the first directors of the petitioner, continued to serve as directors throughout the taxable years in controversy. They were the first members of the petitioner and continued as the only members until April 1937, when the number of members, as well as the number of directors, was increased to six, the new members and directors elected being John W. and Richard A. Needles, sons of William B. Needles, and F. M. Whitsell, son-in-law of William B. Needles. On August 5, 1937, the petitioner's by-laws were amended to provide for three vice *156 presidents and an assistant secretary. At that time S. Elva Needles, wife of Willam B. Needles, and Joseph Stanley Sullivan were elected to the two new offices of vice president, and George S. Doty was elected as assistant secretary. On November 9, 1937, Occhiena resigned as a member of petitioner but continued as a director, and S. Elva Needles was elected to the membership theretofore held by Occhiena. On November 10, 1937, the members voted to increase the number of directors to ten and on November 17, 1937, it was decided that only three new directors would be elected at that time. On that date W. Jerome Heather, C. Stanley McGuire and Joseph Stanley Sullivan were elected as directors. William B. Needles has been president of the petitioner continuously since its formation, and is well known in the field of optometric education. He is the principal executive officer of the petitioner and in general charge of its affairs. He spends a considerable portion of his time away from the school attending the meetings of national, state and district organizations of optometrists, where he makes addresses, lectures, conducts study classes, or otherwise participates in their programs. His *157 purpose in such activities has been to promote educational optometry and the newer concepts of practice and to illustrate some of the methods of teaching optometry at petitioner's school, with an ultimate view of obtaining students. However, no trips were made by him solely for the purpose of getting enrollments. As president of petitioner and pursuant to authorization granted by the board of directors, he employed the teachers and other employees of the school and fixed all salaries paid to them. Upon the formation of the petitioner, Occhiena became vice president and dean of its school, and continued as such throughout the taxable periods involved herein. In 1937 and 1938 he was in his late sixties and his health was failing fast. He retired in 1942. L. E. Needles became secretary and treasurer of petitioner upon its formation and continued as such throughout the taxable periods here in controversy. John W. Needles is about 32 years of age. After completing high school he entered petitioner's school and graduated about 1929 or 1930. Almost continuously since graduation, he has been connected with the latter school in different capacities. He first served as staff man in the clinic, *158 later becoming assistant director of the clinic. For a period he served as an instructor in laboratory work. He has always served as a counselor and monitor of students and looked after the proper housing and conduct of the students. For some time prior to as well as during the taxable periods involved herein his main activity has been to cultivate the good will of graduates, to attend conventions, to look after the publication of the school's prospectus, and otherwise generally to promote enrollment. Richard A. Needles is about 30 years of age. After completing high school he enrolled in the University of Chicago for certain special subjects in science. Afterwards he entered the petitioner's school and graduated about 1931. In 1936 and continuing through the taxable periods involved herein he was employed by the petitioner. His duties were primarily those of a field agent attempting to obtain students and increase enrollment. When not engaged in such activities, he served in the clinic as assistant in teaching clinical optometry. S. Elva Needles assisted William B. Needles in establishing the Needles Institute of Optometry. In connection with that school, she read periodicals relating *159 to the field of optometry, extracted pertinent material therefrom, and assisted with the correspondence. She has done no teaching for the petitioner, nor taken any active part in the conduct of its school. Her participation in petitioner's affairs has consisted of conferring or counseling with her husband, William B. Needles. During most of the time since the formation of the petitioner she has received income from it, and at times payment thereof has been made through a drawing account. F. M. Whitsell is a physician and has been in charge of the ophthalmological department of the college since 1937, but has not devoted his full time thereto. C. Stanley McGuire is a physician. He was associated with the Northern Illinois College of Ophthalmology and Otology, and upon the formation of the petitioner, became associated with and has continued with it primarily as a teacher of anatomy. During the taxable periods involved herein he also served either as registrar or assistant to the dean. W. Jerome Heather entered the petitioner's employ in 1930, and was director of petitioner's clinic in 1937 and 1938. He also delivered lectures at various conventions and engaged in other activities *160 calculated to build up good will for the school. Joseph Stanley Sullivan is an attorney and did his first work for petitioner in 1936. Since his election as director and vice president in 1937, he has devoted part of his time to petitioner's affairs. George S. Doty, elected assistant secretary of petitioner in 1937, is an accountant and has served as auditor for petitioner since 1933. At the suggestion of William B. Needles, the petitioner's board of directors on February 10, 1937, adopted a resolution approving the indicated amounts as the salaries of the following named persons, for the period January 1 to August 31, 1937: William B. Needles
$16,000
L. E. Needles
4,000
John W. Needles
2,400
F. M. Whitsell
1,600
C. Stanley McGuire
2,300
W. Jerome Heather
3,200
Ernest Occhiena
3,300
$32,800
The petitioner maintained drawing accounts on its books for each of the abovenamed persons. During the period January 1 through August 31, 1937, their respective accounts were credited with the indicated salaries and were charged with the same amounts which were actually withdrawn by them. In addition to the above-indicated salary, William B. Needles was allowed $5,132.25 for *161 traveling expenses for the period. Upon the recommendation of William B. Needles, the petitioner's board of directors on August 5, 1937, adopted a resolution approving bonuses of $5,000 each to L. E. Needles, John W. Needles, F. M. Whitsell, C. Stanley McGuire and W. Jerome Heather, or a total of $25,000. A resolution was also adopted directing that the bonuses be paid as soon as funds became available. During the early part of August of each year the amount of petitioner's cash is smaller than at any other time of year, but by the end of August or the first of September it has greatly increased. On August 31, 1937, the petitioner's cash amounted to $11,156.13. With respect to said bonuses the petitioner, on August 18, 1937, issued checks as follows, being the amount of bonus approved for each recipient or such amount less social security tax payments: L. E. Needles
$ 5,000.00
John W. Needles
4,993.50
F. M. Whitsell
4,985.00
C. Stanley McGuire
4,991.70
W. Jerome Heather
5,000.00
$24,970.20 The checks were not cashed by the recipients but were endorsed and returned to the petitioner, which deposited them to its credit in its bank account. Thereupon the petitioner *162 set up on its books with respect to each recipient a new account designated a "loan" account, in which the amount of the respective checks was recorded as a liability owing by petitioner to the respective recipients. On September 6, 1937, the petitioner's directors adopted a resolution reciting the petitioner's acceptance of the following amounts as donations from the named persons: L. E. Needles
$ 5,000
John W. Needles
4,500
F. M. Whitsell
4,500
C. Stanley McGuire
5,000
W. Jerome Heather
5,000
$24,000 Immediately following the adoption of the foregoing resolution, the petitioner made book entries treating the recited amounts as donations and transferring them from the "loan" accounts of the respective persons to petitioner's surplus account. On its income and excess profits tax return for the period January 1 through August 31, 1937, the petitioner reported a net loss of $14,213.84. This was after deducting compensation or salary for the following persons, among others, of the indicated amounts: William B. Needles
$16,000
Ernest Occhiena
3,300
L. E. Needles
9,000
W. Jerome Heather
8,200
C. Stanley McGuire
7,300
John W. Needles
7,400
F. M. Whitsell
6,600
$57,800
*163 Including in the amounts deducted with respect to L. E. Needles and John W. Needles, F. M. Whitsell, C. Stanley McGuire and W. Jerome Heather were the bonuses of $5,000 each, and totaling $25,000, approved by the directors on August 5, 1937. In determining the deficiencies involved herein the respondent determined that the petitioner was not a corporation exempt from income and excess profits taxes. In determining the deficiency for the period January 1 through August 31, 1937, the respondent determined that of the $57,800, deducted as set forth in the preceding paragraph, $25,000 was not allowable. At the suggestion of William B. Needles, the members of the petitioner adopted a resolution on November 17, 1937, which provided that certain stated salaries be paid certain named officers and employees for the fiscal year ended August 31, 1938. Due to the petitioner's lack of money with which to pay the stated salaries, William B. Needles, pursuant to his power to fix salaries, reduced the amounts of the salaries in the case of himself, L. E. Needles and John W. Needles and F. M. Whitsell. The following are the amounts of the salaries of the respective officers and employees as stated *164 in the resolution and the amounts that were actually credited to them during the fiscal year 1938: Salary stated
in the
Salary
resolution
credited
William B. Needles
$ 40,000
$ 30,000.00
L. E. Needles
20,000
18,000.00
John W. Needles
19,800
12,000.00
Richard A. Needles
18,000
10,200.00
S. Elva Needles
10,000
4,999.99
F. M. Whitsell
17,400
8,000.00
Ernest Occhiena
9,800
9,800.00
W. Jerome Heather
9,800
9,800.00
C. Stanley McGuire
8,600
8,600.00
$153.400
$111,399.99 In addition to the salary credited to William B. Needles he was allowed $7,500 for traveling expenses. On January 28, 1938, the petitioner's directors adopted a resolution reciting the petitioner's acceptance of the following amounts as donations from the named persons: L. E. Needles
$ 3,000
John W. Needles
1,000
Richard A. Needles
500
S. Elva Needles
500
F. M. Whitsell
1,000
C. Stanley McGuire
3,000
W. Jerome Heather
2,000
$11,000 Thereafter in January 1938 the petitioner made book entries treating the recited amounts as donations and transferring them from the accounts carried by it for the respective persons to petitioner's surplus account. The resolution adopted *165 by petitioner's directors on September 6, 1937, reciting the acceptance of certain amounts as donations, as heretofore set forth, also recited the acceptance of a donation of $5,000 from Ernest Occhiena. That amount was transferred from Occhiena's account to petitioner's surplus account in September 1937. In August 1938 the petitioner made book entries transferring to an account designated "Loans Payable" the following indicated amounts from the accounts it was carrying for the following persons: L. E. Needles
$ 6,000
C. Stanley McGuire
5,000
W. Jerome Heather
4,800
$15,800 On September 30, 1939, the amounts of $5,000 and $4,800 shown with respect to C. Stanley McGuire and W. Jerome Heather were transferred as donations from the "Loans Payable" account to petitioner's surplus account. On October 31, 1939, the amount shown with respect to L. E. Needles was transferred back to her account and subsequently withdrawn by her. In its income tax return for the fiscal year 1938, the petitioner reported a net loss of $2,645.28. This was after taking a deduction as compensation or salaries of the amount of $111,399.99, shown above as salary credited to certain officers and employees *166 during the year. In determining the deficiency for that year, the respondent determined that $35,299.99 of said amount was not allowable. The petitioner has no endowment or funds invested in anything productive of income other than the school facilities. Its income consists of receipts from tuition and fees of students, proceeds from the sale of textbooks to students, and the receipts from the operation of the clinic. The following is a statement of the petitioner's gross income, total salaries and the percentage that salaries were of gross income for the years 1928 through 1939: Year
Gross Income
Salaries
Percentage
1928
$ 38,306.73
$ 14,247.34
37.19
1929
42,850.75
22,323.74
52.10
1930
55,709.38
27,739.81
49.79
1931
75,375.78
40,534.14
53.78
1932
84,237.62
42,656.86
50.64
1933
99,332.23
53,895.63
54.26
1934
95,119.06
64,741.55
68.06
1935
103,599.53
50,518.87
48.76
1936
159,688.17
102,858.48
64.41
8 months 1937
153,801.57
* 98,422.97
63.99
Fiscal 1938
283,963.31
* 184,464.29
64.96
Fiscal 1939
253,420.78
164,969.98
65.10
*167 The following is a statement of the salaries paid by petitioner to the following persons during the indicated years: 1928
1929
1930
1931
1932
William B. Needles
[1] $3,259.14
[1] $7,651.54
$ 5,171.81
$ 9,429.14
$ 6,474.94
L. E. Needles
2,750.00
2,825.00
3,325.00
4,250.00
3,696.00
John W. Needles
[2] 1,012.50
[2] 468.00
S. Elva Needles
3,575.00
3,022.50
3,013.00
Ernest Occhiena
[1] 2,121.00
[1] 3,200.00
[1] 2,700.00
[1] 3,210.00
[1] 3,212.50
C. Stanley McGuire
[3] 645.00
[1] 1,410.00
[2] 2,153.00
[3] 2,159.00
[2] 2,304.00
W. Jerome Heather
[4] 700.00
[1] 2,150.00
3,660.00
1933
1934
1935
1936
William B. Needles
$11,601.96
$18,030.06
$16,700.00
$24,000.00
L. E. Needles
3,555.00
4,800.00
4,800.00
Not shown
John W. Needles
[3] 1,650.00
[3] 1,050.00
[3] 750.00
3,060.54
S. Elva Needles
2,450.00
3,600.00
3,600.00
None
Ernest Occhiena
[1] 2,700.00
3,000.00
3,750.00
10,175.00
C. Stanley McGuire
[2] 2,400.00
2,750.00
3,360.00
8,050.00
W. Jerome Heather
4,800.00
4,800.00
4,000.00
9,980.00
Richard A. Needles
[5] 2,495.00
*168 In the taxable year ended August 31, 1938, the petitioner was the owner of a building used for school and clinic purposes. The building was of brick and concrete construction but not fireproof. It was constructed specially for the petitioner's use for school and clinic purposes, and was completed in 1937. The petitioner also was the owner of another building, acquired in 1937, and used as a dormitory for students. Neither the character of the construction of this building, the date of its erection nor its expected useful life from the date of acquisition by petitioner is disclosed. It formerly had been operated for an undisclosed period as a hotel. The cost to the petitioner of the school and clinic building and the dormitory was $218,399.86. The cost of the plumbing and heating equipment therein, designated by petitioner as building equipment, was $68,789.12. In its income tax return for the fiscal year 1938, the petitioner took a deduction of $16,261.99 for depreciation. In determining the deficiency for the fiscal year 1938, the respondent determined that a reasonable allowance for depreciation was $12,892.07 and disallowed as excessive $3,369.02 of the amount deducted by petitioner. *169 In making his determination, the respondent used a 50-year life in computing depreciation on the petitioner's school building and allowed $2,162.52 for depreciation thereon. In petitioner's balance sheet at the close of the taxable period ended August 31, 1937, is a liability item designated "Students' Deposits", in the amount of $7,112.04. Of that amount, $6,271.20 represented payments by students during the current period of tuition applicable to an instruction period beginning subsequent to the close of the taxable period ended August 31, 1937; $715.60 represented tuition paid in prior years; and $125.24 represented clinic and laboratory breakage deposits. The $7,112.04 was not included as income by petitioner in its return for the period ended August 31, 1937, but was included in its return for the fiscal year ended August 31, 1938. In petitioner's balance sheet at the close of the fiscal year 1938 is a liability item designated "Unearned Tuition", in the amount of $39,163.80. Of that amount, $23,319.67 represented payments by students during the current year, principally during August 1938, of tuition applicable to an instruction period beginning after the close of the fiscal *170 year ended August 31, 1938. The $23,319.67 was not reported by petitioner as income for the fiscal year 1938, but was included as income in its return for the fiscal year ended August 31, 1939. In determining the deficiency for the fiscal year 1938, the respondent included in taxable income the amount of $16,013.53 representing a portion of the above-mentioned $23,319.67 of tuition paid in advance in that fiscal year. By amended answer, the respondent asks that the entire amount of $23,319.67 be included in the petitioner's income on the ground that such tuition constituted income taxable in said fiscal year. Opinion It is the claim of the petitioner that it is a nonprofit educational institution and, as such, is exempt from income and excess profits taxes under section 101 (6) of the Revenue Acts of 1936 and 1938, [1] and it is only in the event that contention is denied that it will become necessary to decide the questions relating to the determination of taxable net income. *171 To qualify for exemption under section 101 (6), supra, it must appear that petitioner was "organized and operated exclusively for * * * educational purposes" and that no part of its "net earnings * * * inures to the benefit of any private shareholder or individual." Functionally, we think it may be said that the petitioner was organized and operated exclusively for educational purposes, but with respect to its earnings we do not think it meets the test of the statute for exemption. It is our opinion that the record amply shows that petitioner was operated with the view of making profit and that it was the intention and purpose that those profits should inure to the benefit of its members and other individuals participating in its operation, particularly the members of the family of William B. Needles. Under the form of its organization, the petitioner had members, not stockholders. Under the Illinois statute and petitioner's by-laws, only members are eligible to become directors. The directors are electable annually by the members of the corporation, and the directors so elected have the power to elect members. From its organization Needles and the members of his family have *172 constituted a majority of petitioner's members and board of directors, and since November 1937 it has had no members outside his immediate family, except and unless his sister and his son-in-law be excluded. Over the same period, that is, since November 1937, petitioner's board of directors has consisted of nine members, five being members of the Needles family group. The remaining four not being members of the corporation, have served as directors in direct contravention of the Illinois statute and of petitioner's by-laws. The petitioner has no endowment, and until the erection of one building, completed in 1937 and the acquisition of another building in the same year, it had no property in so far as the record discloses beyond its school equipment. It depended almost entirely on tuition for its revenue, and most of the time of John W. and Richard A. Needles and a very substantial portion of the time of William B. Needles was devoted to the procurement of new students. As enrollment increased, revenues increased, and as the revenues increased correspondent increases were made in the "salaries" of petitioner's members, officers and directors. Salaries were fixed by William B. Needles, *173 and while some statements appear in the testimony to the effect that his fixing of salaries was under authority of the board of directors, it is to be recalled that a majority of the members of the board of directors at all times consisted of members of his family group, and the facts show that they, more than others, benefited by the "salary" increases made by him. There seems to be no question that his action in such matters was in fact controlling. Needles himself testified that it was his policy to distribute as salaries all of the earnings "not required for legitimate operations." We find, for instance, that the enrollment increased from 340 in 1935 to 850 for 1938 and that Needles' own salary moved from $16,700 in 1935 to $30,000 in 1938; that of his sister, from $4,800 to $18,000; that of his son John, from $740 to $12,000; that of Occhiena, from $3,750 to $9,800; that of McGuire, from $3,360 to $9,800; and that of Heather, from $4,000 to $9,800. Richard A. Needles apparently was employed for the first time in 1936, at a salary of $2,495, and in 1938 his salary had been increased to $10,200. Whitsell, the son-in-law, was employed by petitioner upon the completion of his interneship, *174 and, so far as we can tell from the record, his first salary was paid in 1937. For the first 8 months of that year his salary was $1,600 plus a bonus of $5,000, more fully dealt with hereafter under another issue, while his salary for 1938 was fixed at $8,000. The margin between the earlier salaries and those originally fixed by Needles for 1938 was even greater than shown above. The 1938 salaries for the Needles family group as originally fixed by Needles totaled $125,000, as compared with the $83,199.99 actually credited to them on the books and with the $25,850 paid to them in 1935. The $25,850 for 1935 did not include any amounts for Richard A. Needles or F. M. Whitsell, who apparently were not then employed. The reduction of the amount originally fixed as salaries for 1938 to the amounts actually credited was apparently due to a failure to realize revenues in the amounts originally anticipated. One explanation by Needles of the increased amounts credited as salaries was that it was his purpose to increase the salaries of those whom he believed entitled to increases in consideration for services rendered and for which they had not been properly compensated over a long period. *175 Richard Needles and Whitsell, of course, had been employed for only a short time. Occhiena, McGuire and Heather had been with the petitioner for a long time and all received increases in salary, but with respect to some of the additional sums credited to them there is good reason to conclude that it was the understanding when the increases were granted that substantial amounts should be turned back to the petitioner for use in its building program. Similarly L. E. Needles, John W. Needles and Whitsell, all members of the Needles family group, turned back portions of the amounts credited to them as salary bonus, but in their cases the amounts of the increases were substantially greater than in the cases of Occhiena, McGuire and Heather, even though the services of the last three mentioned had extended over a much longer period than any of the others, with the possible exception of L. E. Needles. S. Elva Needles, wife of William B. Needles, received in 1938, $4,999.99, and $3,000 or more in a number of prior years, although it is conceded that she performed no direct services for the petitioner whatever. Furthermore, there is nothing in the record to substantiate or corroborate the *176 assertion of Needles that any of the individuals were in fact underpaid in the prior years for services which they rendered. We have no information to show or indicate comparable salaries for similar services in other schools or institutions; neither do we have any information from which an independent conclusion might be drawn. The petition does contain an allegation to the effect that according to a United States bulletin the average income of all practicing optometrists is $7,500 annually, and further, that it is not unusual for a practicing optometrist to have an income of $20,000 per year. Assuming that the individuals in question could and would have practiced optometry if not otherwise employed, no proof was offered to support the allegations contained in the petition. Furthermore, except for the fact that in one instance the functions would be the teaching of the theory of optometry and the other would be the practical application of such theory, there is nothing to indicate that a fair and just salary in the teaching field is to be gauged by or compared to the income of a practicing optometrist. The close parallel of the increase in petitioner's income and the increase in *177 the credited salaries along with other facts of record have led us to the conclusion that the crediting or payment of the amounts under consideration was not related to or based upon services performed, but represented a means and practice of distributing petitioner's net earnings under the guise of salary. On the facts of record, the petitioner does not meet the test prescribed by section 101 (6), supra, for exemption from income and excess profits taxes. In passing, it is to be noted also that under Illinois law the members of an institution organized as the petitioner was have the power and authority to dissolve the corporation, by resolution to that effect, and when all debts of the corporation have been paid to receive distribution of the corporate assets. Jones Illinois Statutes, Annotated, Vol. 5, Chapter 32, section 32.255. The first and most important issue having to do with the determination of taxable net income involves the disallowance by the respondent of $25,000 for the period January 1 to August 31, 1937, and $35,299.99 for the fiscal year ended August 31, 1938, of the salary deductions claimed by the petitioner for those periods. In his notice of determination, *178 the respondent put his disallowance on two grounds. One was that as to the total amount disallowed for the 8-month period in 1937 and $30,800 of the amount disallowed for the fiscal year 1938, such amounts were not in fact paid or made available to the officers and employees during such taxable periods and that the petitioner incurred in the said periods no bona fide obligation to pay the said items to them. The other ground was that the aggregate of the salaries of William B. Needles, L. E. Needles, John W. Needles, Occhiena, Heather, McGuire and Whitsell for the first 8 months of 1937, the aggregate amount being $57,800, was excessive and only $32,800 might be regarded as reasonable compensation for services actually rendered, and that the aggregate of the salaries of William B. Needles, L. E. Needles, Occhiena, Heather, McGuire, Richard A. Needles, John W. Needles, S. Elva Needles and Whitsell for 1938, the aggregate amount being $111,399.99, was excessive and only $76,100 might be regarded as reasonable compensation for the services rendered by those individuals. As to S. Elva Needles, it is specifically stated that the salary paid or credited to her for 1938 was disallowed for *179 the reason that she performed no material service to the petitioner during the taxable year. The conclusion that $25,000 of the amount claimed as salary deduction for the first 8 months of 1937 was not in fact paid or made available to the officers or employees and that petitioner incurred no bona fide obligation to them for that amount is based on the treatment of and occurrences related to the so-called bonuses of $5,000 each voted to L. E. Needles, John W. Needles, Whitsell, McGuire and Heather in August of 1937. It was known at the time the bonuses were voted or allowed that the money to pay them was not available and the facts show that when the checks were issued they were not cashed by the recipients but were endorsed and returned to petitioner and the amounts represented thereby set up as loans to it. Within less than a month, however, the entire amount of $25,000, except $500 for John W. Needles and $500 for Whitsell, was cleared back into the petitioner's funds as donations by the five individuals in question. The remaining $1,000, according to Doty's testimony, was cleared back as donations in January, following. From the testimony of William B. Needles, we think the conclusion *180 is justified that there was never any intention that the amounts in question should be paid to and retained by the individuals named. The building program of petitioner was then under way and the checks were issued with the understanding that the amounts represented thereby would not be withdrawn, one of the purposes of such action being to give the recipients a feeling that they had participated in the building program of petitioner. On the record here, we think the respondent is sound in his conclusion that the amounts were not actually paid as salaries and that no liability therefor was incurred by the petitioner in connection therewith. As to $30,800 of the amount disallowed by the respondent from the salary deduction claimed for the fiscal year 1938, the respondent has made a determination and offers an argument comparable to that considered with respect to the $25,000 disallowance for the 8-month period of 1937. The $30,800 consists of $5,000 attributed to a donation by Occhiena in September of 1937, $10,000 of the amounts listed as donations by L. E. Needles, John W. Needles, Richard A. Needles, S. Elva Needles, Whitsell, McGuire and Heather in January of 1938, and $15,800 *181 set up in August 1938 as loans from L. E. Needles, $6,000; McGuire, $4,800; and Heather $4,800. The $5,000 listed as a loan from McGuire and the $4,800 as a loan from Heather were shortly thereafter cleared into the accounts of the petitioner as donations. The $6,000 listed as a loan from L. E. Needles was something more than a year later transferred back to her individual account and was subsequently withdrawn by her. Considering the practice in which the petitioner was then indulging, namely, that of distributing its entire net revenues by way of salary credits to the various members, officers and directors and of then taking back as loans and donations by charges against the accounts of the individuals the amounts needed in its building program and, as indicated by Doty in his testimony, in order to improve its financial statement for the purpose of procuring loans, it is our conclusion that the action of the respondent in disallowing $30,800, treated as above indicated, as salary deductions for the fiscal year ended August 31, 1938, was justified. See and compare ; ; *182 and . The remainder of the salary deduction disallowed for that year is more than covered by the salary credited to S. Elva Needles. In our opinion, the evidence of record amply justifies the disallowance of her salary. See and compare . Disallowance of the whole amount, however, would bring the total of salary deductions disallowed to $35,799.99 instead of $35,299.99, actually disallowed by the respondent. The respondent has made no claim for any increased disallowance of the salary deduction and the added $500 of the salary deduction and the added $500 of the salary credited to S. Elva Needles will be permitted to remain as a deduction. Petitioner has particularly attacked the action of the respondent as to the disallowance of the salary deductions claimed for the reason that one ground for such disallowance was that the aggregate of the salaries of a group of officials was excessive when related to the services performed by them as a group and not that the individual salaries were out of line with the individual services performed. The petitioner relies particularly *183 on the opinion of the Board in . In that case the petitioner was making the contention that in disallowing a salary deduction or part thereof on the ground that it was excessive, the disallowance should and must be based on a consideration of aggregate salaries and services of officers and employees rather than the salary and services of any individual employee. The Board denied the contention of the petitioner and considered the relation between the services performed by the individual officer or employee and the salary paid, but it did not hold, and that case is not authority for the proposition that compensation to a group is never to be considered in the aggregate in determining an allowable deduction for services actually rendered. ; certiorari denied, . See also . In view, however, of the conclusions previously reached which sustain the action of the respondent in the disallowance of the salary deductions claimed, it is unnecessary *184 for us here to decide whether a determination that the aggregate salaries of a group are excessive is proper or improper. The petitioner contends that depreciation is to be computed on building equipment separately from the buildings which house such equipment and that it is entitled to compute depreciation on its school building at the rate of 3 percent instead of 2 percent, as used by the respondent. So far as shown, the respondent computed depreciation on the building equipment separately from the buildings. As to the rate of depreciation applicable to the school building, the petitioner submitted some evidence as to deterioration, since 1937, of the neighborhood in which the school building is located and its effect on property values in the neighborhood. The evidence shows that since about 1922 the neighborhood has been deteriorating and that the deterioration has been more rapid since the World's Fair in 1934. Erection of the building in question was not completed until 1937, and since there is nothing to indicate that the life of the building or its use by the petitioner has been adversely affected by the deterioration of the neighborhood, we fail to see how the matter of *185 deterioration has any bearing on the determination of the question of depreciation. There is no basis on the record here for reversing the respondent's action on this issue. The remaining question is whether the amount of $23,319.67 representing tuition paid in advance during the fiscal year ended August 31, 1938, should be included in the petitioner's income for that year, since it keeps its books and files its returns on the accrual basis. The tuition having been paid for instruction to be furnished in a subsequent taxable period, the petitioner insists that the amount had not been earned by it and therefore was not income to it for the fiscal year 1938 but would be income to it in the taxable period when the instruction was furnished. A contention similar in character was denied in , on the ground that the cash received had, under the statute, already ripened into gross income. Cf. ; . The petitioner also contends that at the close of the fiscal year 1938 it had a liability *186 to refund the tuition under certain circumstances, such as failure or inability of the students to enter college the following September, and that the amount therefore should not be treated as income. So far as the evidence shows, it was not the petitioner's practice to refund to students tuition paid during a quarter or semester for the following quarter or semester where the student did not attend such following quarter or semester. The evidence shows that at August 31, 1937, the petitioner was carrying on its books an amount of $715.60 representing tuition paid in advance in years prior to January 1, 1937. No explanation was offered as to why that money had not been refunded to those who paid it. As to the refunding of tuition to students who are dismissed from school, the petitioner's president testified that where a student is dismissed for cause no refund is made of tuition paid for the term in which the student has been in attendance. As to those students failing to make passing grades, he stated that they are given the privilege of repeating the work and that if they fail the second time they are dropped without any refund. Nothing was said about the situation where the student *187 voluntarily leaves school or leaves because of illness, lack of finances, or other good cause. So far as disclosed, there was no absolute and unconditional liability on the part of the petitioner to refund any portion of the $23,319.67 to anyone. While there might have been a conditional or contingent obligation to make refund of some portion of it upon the happening of certain conditions or events in the future, that is not sufficient to prevent the inclusion of the amount in income. . We therefore hold that the entire amount of $23,319.67 constituted income to the petitioner for the fiscal year 1938. The petitioner urges that it is improper to include in taxable income for 1938 the $23,319.67 and also the tuition paid in advance for the period ended August 31, 1937. We agree with petitioner. At August 31, 1937, the petitioner was carrying on its books liability accounts totaling $7,112.04 which were included in taxable income for 1938 and which consisted of $6,271.20 of tuition prepaid during the current period, $715.60 of tuition prepaid in years prior to January 1, 1937, and $125.24 of clinic and laboratory breakage *188 deposits. The evidence shows that prior to January 1, 1937, the petitioner kept its books and filed its returns on the cash basis and for the calendar year and that beginning as of January 1, 1937, it kept its books and filed its returns on the accrual basis and for a fiscal year ended August 31. Presumably the changes were made with the respondent's permission. The tuition of $715.60 prepaid in years prior to January 1, 1937, and apparently not previously reported as income, was a proper subject for adjustment at that time, but so far as disclosed the respondent set no requirement as to when it should be reported. We know nothing respecting the agreement under which the clinic and laboratory breakage fees of $125.24 were paid. The petitioner reported the $715.60 and $125.24 as income for 1938, and under the circumstances presented we are unable to hold that they were not properly reported. As to the tuition of $6,271.20 prepaid during the period ended August 31, 1937, we hold that it properly belongs in the income for that period and not in the fiscal year 1938. Decision will be entered under Rule 50. Footnotes
*. These amounts include the sums credited as otherwise shown herein to certain officers and employees but later cleared back to petitioner as donations by such officers or employees.↩
1. For 9 months' services. ↩
2. For 8 months' services. ↩
3. For part time only, the period of service not being shown. ↩
4. For 4 months' services. ↩
5. Salary for period January 1, 1937 to August 1, 1937 was $1,667.33.↩
1. SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. The following organizations shall be exempt from taxation under this title - * * * * *
(6) Corporations * * * organized and operated exclusively for * * * educational purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *;↩